RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0302P (6th Cir.)
File Name: 03a0302p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

VIRGINIA SAGAN, as Personal
Representative of the Estate
of RICHARD SAGAN,
deceased; VIRGINIA SAGAN,
in her individual capacity,
          *Plaintiffs-Appellants,*

          *v.*

UNITED STATES OF AMERICA;
ALGONAC FIRE DEPARTMENT;
JOHN STIER; RUSS SEDER;
JERRY DOAN; JOE DOAN,
          *Defendants-Appellees.*

No. 01-2568

———————————

Appeal from the United States District Court
for the Eastern District of Michigan at Flint.
No. 99-40130—Paul V. Gadola, District Judge.

Argued: June 13, 2003

Decided and Filed: August 25, 2003

Before: KEITH, MOORE, and GIBBONS, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Andrew W. Mayoras, BARRON, ROSENBERG, MAYORAS & MAYORAS, Troy, Michigan, for Appellants. Michelle T. Delemarre, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., Daniel P. Dalton, TOMKIW DALTON, Royal Oak, Michigan, for Appellees. **ON BRIEF:** Andrew W. Mayoras, Ronald M. Barron, BARRON, ROSENBERG, MAYORAS & MAYORAS, Troy, Michigan, Gary E. Levitt, LAW OFFICES OF GARY E. LEVITT, Troy, Michigan, for Appellants. Michelle T. Delemarre, Debra J. Kossow, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., Daniel P. Dalton, TOMKIW DALTON, Royal Oak, Michigan, for Appellees.

———————————

## OPINION

———————————

DAMON J. KEITH, Circuit Judge. In this personal injury action, the Plaintiffs appeal a September 10, 2001 order granting Defendant United States' motion for summary judgment and dismissing without prejudice the Plaintiffs' claims against Defendants Algonac Fire Department, John Stier, Russ Seder, Jerry Doan, and Joe Doan. For the reasons set forth below, we **REVERSE** the district court's grant of summary judgment for the United States and **REMAND** the case for further proceedings, with the Plaintiffs' claims against the other Defendants reinstated.

## I. BACKGROUND

On the night of August 30, 1997, Richard and Virginia Sagan took their boat to Little Muscamoot Bay near Algonac, Michigan. They intended to spend the night in the bay with

their friends Greg Grizdowski and Karen Drobot. The Sagans tied their boat to Grizdowski's boat in shallow water. At around 11:30 p.m., after he had been drinking for several hours, Richard Sagan took off his clothes and dove head-first into the bay. His head struck the bottom of the bay, which was less than three feet deep at the point of Mr. Sagan's entry. His spinal column between the C4 and C5 levels was severed on impact.

Realizing that her husband was in trouble, Mrs. Sagan jumped into the water, lifted Mr. Sagan's head, and screamed that he was not breathing. Mrs. Sagan dragged Mr. Sagan toward the boat, yelling at her husband to wake up. Mrs. Sagan and Grizdowski tried unsuccessfully to lift Mr. Sagan onto Grizdowski's boat and then onto the Sagans' boat. Grizdowski performed mouth-to-mouth resuscitation on Mr. Sagan, who began to breathe and moan. Mr. Sagan's breathing was impeded by water in his lungs. He told Grizdowski that he had no sensation in his hands.

At 11:35 p.m., Mrs. Sagan used the radio on her boat to contact the Macomb County Sherriff's Department. At 12:15 a.m., the Algonac Fire Department arrived on the scene in a boat. Three minutes later, the United States Coast Guard arrived by boat and informed those present that a rescue helicopter was on its way and would take Mr. Sagan to the hospital. Mr. Sagan was secured to a backboard on the deck of the Algonac Fire and Rescue boat. According to Mrs. Sagan, Captain Joe Doan of the Algonac Fire Department insisted that Mr. Sagan immediately be taken to a hospital via an ambulance that was waiting a mile away from the boats.

The Plaintiffs contend that the Coast Guard seized control of the situation and prevented the Algonac Boat from leaving, demanding instead that they wait for a Coast Guard helicopter. Sometime after 1:00 a.m., the Coast Guard

helicopter arrived on the scene.[1] Shortly after the helicopter arrived, it was determined that the backboard to which Mr. Sagan had been secured was incompatible with the device needed to lift him to the helicopter. The rescuers agreed that transferring Mr. Sagan to a compatible backboard would risk further injury, and that instead the Algonac Fire Department boat should transport Mr. Sagan to the waiting ambulance. Mr. Sagan was transferred to the ambulance at approximately 1:46 a.m.

Mr. Sagan became a quadriplegic as a result of his dive into shallow water. Within a month of his injury, he began to suffer from pneumonia, which his doctors attributed to the spinal injury's effects on his breathing, to his having inhaled water, and/or to his having suffered from hypothermia. He required complicated pulmonary care, including frequent suctioning, the use of albuterol, Atrovent and Serevent breathing treatments, and percussion and postural drainage therapy. He required assistance to perform most daily activities, including eating, bathing, and going to the bathroom. Mr. Sagan also had numerous respiratory problems, including impaired swallowing and ineffective airway clearance and tracheostomy. He was unable to breathe effectively without ventilator assistance.

On February 1, 1999, the Sagans sued the United States pursuant to the Suits in Admiralty Act, 46 U.S.C. §§ 740 *et seq*. Their complaint alleged that the United States Coast Guard failed to exercise due care while attempting to rescue Richard Sagan after he dove into shallow water, and that the Coast Guard's failure to exercise due care caused and/or exacerbated injuries to Mr. Sagan.

---

[1]The Coast Guard helicopter had initially gone to Fisher Bay, approximately three miles away from Little Muscamoot Bay. The Coast Guard lowered a rescue swimmer near some boats in Fisher Bay, only to learn that they were in the wrong place.

Richard Sagan died on August 9, 1999. According to the death certificate, the "immediate cause" of death was the quadriplegia from which Mr. Sagan had suffered for approximately two years, and the "underlying cause" was pneumonia.

On August 11, 2000, Plaintiff Virginia Sagan filed a Second Amended Complaint in which she alleged that Defendants Algonac Fire Department, John Stier, Russ Seder, Jerry Doan, and Joe Doan acted negligently toward Richard Sagan, and that their negligence proximately caused and/or exacerbated his injuries. These Defendants were all part of the effort to rescue Mr. Sagan but were not associated with the Coast Guard; hereinafter they will be called "the Algonac Defendants."

The parties conducted discovery. On September 15, 2000, the Defendants filed motions for summary judgment. A hearing was held on November 28, 2000, and the parties presented arguments in support of and in opposition to the motions.

In a Memorandum Opinion and Order dated September 10, 2001, the district court granted Defendant United States' motion for summary judgment and dismissed without prejudice the claims against the Algonac Defendants for lack of subject matter jurisdiction. *See Sagan v. United States*, 157 F. Supp. 2d 824 (E.D. Mich. 2001). The district court found that the Plaintiffs had failed to present enough evidence that the United States proximately caused Mr. Sagan's injuries to survive summary judgment. The district court then held that because the claim against the United States was dismissed, the claims against the Algonac Defendants must also be dismissed, because those claims were before the district court based on supplemental jurisdiction.

The Plaintiffs filed this timely appeal.[2] In it, they allege that the district court erred in concluding that there was no genuine issue of material fact as to whether the United States' negligence proximately caused Richard Sagan's injuries. The Plaintiffs ask that their claims against all parties be reinstated and that the matter be remanded to the district court. They further request that on remand, the case be assigned to a different district court judge to preserve the appearance of justice.

## II. ANALYSIS

*A. Standard of Review*

A district court's grant of summary judgment is reviewed *de novo*. *See Holloway v. Brush*, 220 F.3d 767, 772 (6th Cir. 2000). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The judge is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A genuine issue for trial exists only where there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252. The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

---

[2]The Appellants here are Virginia Sagan, as personal representative of the estate of Richard Sagan, and Virginia Sagan, in her individual capacity. We refer to them as "the Plaintiffs" throughout this opinion.

## B. Analysis

### 1. The Plaintiffs' Claim Against the United States

The Suits in Admiralty Act (SIAA) "is the exclusive remedy against the United States for maritime torts . . . . In contrast to the Federal Tort Claims Act . . ., the SIAA does not incorporate state tort law, inasmuch as maritime tort law is federal law." *Good v. Ohio Edison Co.*, 149 F.3d 413, 420 n.13 (6th Cir. 1998). The SIAA does not itself create a cause of action against the United States. *See Good*, 149 F.3d at 419. Rather, a plaintiff must show that the United States would be liable under maritime tort law for the same conduct.

The United States Coast Guard does not have an affirmative duty to rescue persons in distress. Federal law merely provides that the Coast Guard "shall" establish and operate rescue facilities and that it "may" render aid to protect persons and property at any time such facilities are available. *See* 14 U.S.C. § 88. However, once the Coast Guard undertakes a rescue operation, it must act with reasonable care. *See Patentas v. United States*, 687 F.2d 707 (3d Cir. 1982). Its actions are judged according to the so-called "Good Samaritan" doctrine. *See id.* at 713-14. Under this doctrine, a defendant is liable for breach of a duty voluntarily assumed by affirmative conduct, even when that assumption of duty was gratuitous. *See id.* (citing *Indian Towing Co. v. United States*, 350 U.S. 61 (1955)). The Restatement (Second) of Torts has described the doctrine as follows:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of harm, or (b) the harm is suffered because of the other's reliance upon the undertaking.

Restatement (Second) of Torts § 323b (1965).

To prevail in this case, the Plaintiffs must prove that the Coast Guard was negligent in carrying out its rescue of Mr. Sagan, and that the Coast Guard's negligence proximately caused some of his injuries. Thus, in order to survive summary judgment, the Plaintiffs must produce evidence sufficient to create a genuine issue of material fact as to whether the risk of physical harm to Mr. Sagan was increased by the Coast Guard's negligence. "The test is not whether the risk was increased over what it would have been if the defendant had not been negligent," but rather whether "the risk was increased over what it would have been had the defendant not engaged in the undertaking at all." *Myers v. United States*, 17 F.3d 890, 903 (6th Cir. 1994).

With these standards in mind, we now proceed to evaluate the evidence in this case to determine whether it gives rise to a genuine issue of material fact as to whether the Coast Guard's negligence proximately caused injury to Richard Sagan.[3] The Plaintiffs do not contend that the Coast Guard is in any way responsible for Richard Sagan becoming a quadriplegic. Mr. Sagan became a quadriplegic when he dove head-first into shallow water. Instead, the Plaintiffs contend that the Coast Guard's negligence in delaying the rescue[4]

---

[3] The proximate cause element was the focus of the United States' motion for summary judgment and the basis for the district court's grant of summary judgment. The United States does not appear to dispute that it was negligent, and no one disputes that Mr. Sagan sustained injuries on the night in question. Therefore, our focus will be on the issue of proximate cause as well. *See American & Foreign Insurance Co. v. General Electric*, 45 F.3d 135, 140 (6th Cir. 1995) ("Of all the elements necessary to support recovery in a tort action, causation is the most susceptible to summary determination.")

[4] The Coast Guard delayed the rescue of Mr. Sagan by insisting that the rescuers wait for a helicopter rather than transport him by boat to a waiting ambulance. The district court concluded that the Coast Guard's actions delayed the rescue by 55 minutes. The Plaintiffs continue to assert

contributed to Mr. Sagan's development of hypothermia, pulmonary and respiratory problems, and pneumonia.

In support of this contention, the Plaintiffs point to the affidavit of Dr. Ralph E. Dilisio, one of Richard Sagan's treating physicians at St. John's Hospital. Dr. Dilisio stated that "the significant hypothermia caused by the delay did contribute to Mr. Sagan's respiratory complications. Specifically, the detrimental systematic effects, including the pulmonary dysfunction, resulted in Mr. Sagan being significantly more ventilator dependent than he would have been without the delay, among other complications." J.A. at 844 (Affidavit of Ralph E. Dilisio, M.D.). Dr. Dilisio also stated that the delay "resulted in Mr. Sagan being far more susceptible to pneumonia," and that the pulmonary problems that Mr. Sagan suffered were "far more severe than I would expect from an individual with his level of spinal injury." *Id.* Finally, Dr. Dilisio recited the "well-recognized medical principle that not appropriately securing a victim's head and neck, resulting in movement of the head and neck, after a severe C4-C5 spinal cord injury is an aggravating factor to the spinal cord injury." *Id.*

The Plaintiffs also rely on the affidavit of Dr. Jennifer Doble, who treated Mr. Sagan at Lakeland Center. According to Dr. Doble, "Mr. Sagan had severe and substantial respiratory problems which caused him to be much more ventilator dependent than a typical C4-C5 quadriplegic. In addition, the respiratory problems caused Mr. Sagan to be far more susceptible to pneumonia." J.A. at 851 (Affidavit of Jennifer Doble, M.D.). Dr. Doble stated that in her medical opinion, Mr. Sagan died from pneumonia. *See id.*

that the time of the delay was in fact one hour and 20 minutes. The evidence is ambiguous regarding exactly how much delay the Coast Guard caused, but the evidence is uncontradicted that the Coast Guard caused a delay.

As the Plaintiffs are quick to point out, the report of an expert witness for the defense also lends support to the Plaintiffs' argument that the delay caused injury to Mr. Sagan. According to Dr. Alberto Martinez-Arizala,

> In one area, specifically hypothermia, the delay in rescue probably had an untoward effect. Hypothermia has detrimental systemic effects that include pulmonary dysfunction and it could have contributed to his respiratory compromise. . . . Upon arrival at St. John's hospital his temperature was recorded at 86.7° F, which is significantly low. So he was significantly hypothermic and this could have contributed to his complications.

J.A. at 598 (Report of Defendant's Expert Witness Alberto Martinez-Arizala, M.D.). Dr. Martinez-Arizala also stated that "[a]nother complication of his injury that may be related to the delay in transportation was the development of aspiration pneumonia", although "it is likely that it would have occurred even if he had been transported sooner." *Id.*

The Plaintiffs note that one of the Algonac Defendants, Joe Doan, also testified as to the importance of transporting Mr. Sagan to a hospital as soon as possible to prevent hypothermia and pneumonia. In his deposition, Captain Doan, a state-licensed paramedic, stated that he believed Mr. Sagan needed intravenous fluids to warm his body.

The district court found that the Plaintiffs had not produced evidence that the Coast Guard's actions caused Mr. Sagan's injuries to be worse or more numerous than they would have been had the Coast Guard not attempted the rescue at all. The district court characterized the Plaintiffs' evidence as "no more than conjecture or speculation" and "insufficient to raise an issue of fact to defeat a summary judgment motion." *Sagan v. United States*, 157 F. Supp. 2d 824, 829 (E.D. Mich. 2001). We respectfully disagree. We think the Plaintiffs have produced evidence sufficient to create a genuine issue of material fact as to whether the Coast Guard's negligence in

delaying the rescue proximately caused injury to Richard Sagan. The evidence presented to the district court was expert medical opinion from physicians who had treated Mr. Sagan; it was not merely "conjecture or speculation." We think a reasonable trier of fact could find for the Plaintiffs on the issue of causation based on the testimony of Drs. Dilisio, Doble, and Martinez-Arizala. All three experts agreed that, at the very least, the delay "probably" contributed to Mr. Sagan's injuries.

Furthermore, it is telling that the defense's own expert witness, Dr. Martinez-Arizala, stated in his report that "*the majority* of Mr. Sagan's injuries resulted from his original trauma at the time of his accident, and not from actions or lack of actions of his rescuers." J.A. at 597 (Martinez-Arizala Report) (emphasis added). The United States cites this statement in its brief, as though it supports the United States' position. On the contrary, it supports the Plaintiffs' argument for causation inasmuch as Dr. Martinez-Arizala acknowledges that *some* – "a minority" – of Mr. Sagan's injuries resulted from the actions or lack of actions of his rescuers. Of course, the law does not require a plaintiff to prove that *the majority* of his injuries were proximately caused by the defendants. Indeed, in this case, it seems fairly clear that the majority of Mr. Sagan's injuries were caused by his head-first dive into shallow water. The important question is whether the Coast Guard's negligence in rescuing Mr. Sagan caused additional injury, not whether those additional injuries amount to a majority or a minority of all the injuries sustained by Mr. Sagan on the night in question.

We are also puzzled by the district court's statement that the Plaintiffs "have not produced evidence that Defendant's actions increased Plaintiff Richard Sagan's injuries over what those injuries would have been had Defendant not attempted the rescue at all." 157 F. Supp. 2d at 829. It is clear from the record that from the moment they arrived on the scene, the Algonac Defendants wanted to transport Mr. Sagan by boat to a waiting ambulance. The Coast Guard prevented them

from carrying out this plan, and the approximately one hour delay ensued. Thus, the delay would not have occurred had Defendant United States not attempted the rescue at all.

For these reasons, we find that the Plaintiffs have presented sufficient evidence to create a genuine issue of material fact as to whether the Coast Guard's negligence in delaying the rescue of Richard Sagan proximately caused him injury.

### 2. The Plaintiffs' Claims Against the Algonac Defendants

28 U.S.C. § 1367(a) provides that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." We review a determination of whether a district court has jurisdiction *de novo. Blakely v. United States*, 276 F.3d 853, 860 (6th Cir. 2002).

After the district court granted the United States' motion for summary judgment, the court dismissed without prejudice the Plaintiffs' purely state law claims against the Algonac Defendants for lack of subject matter jurisdiction. In their complaint, the Plaintiffs assert only state law claims against the Algonac Defendants and explicitly state that they are not invoking admiralty jurisdiction as to the Algonac Defendants. We leave for the district court the issue of whether the state law claims are preempted by federal maritime law. The district court noted that the Algonac Defendants were in federal court based on supplemental jurisdiction. The Supreme Court has held that "if the federal claims are dismissed before trial, . . . the state claims should be dismissed as well." *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966).

The district court's dismissal of the claims against the Algonac Defendants was proper in light of its grant of summary judgment for the United States. However, because

we now reverse the district court's grant of summary judgment for the United States and remand this case for further proceedings, the claims against the Algonac Defendants must also be remanded based on 28 U.S.C. § 1367(a). *See Jackson v. City of Columbus*, 194 F.3d 737, 757 (6th Cir. 1999), *overruled on other grounds by Swierkiewics v. Sorema N.A.*, 534 U.S. 506 (2002) (remanding a state defamation claim to the district court after reversing the district court's dismissal of a federal claim).

3. The Necessity of Reassignment

The Plaintiffs argue that on remand, this case should be assigned to a different district court judge. We have the authority to do this under 28 U.S.C. § 2106. However, as we have frequently emphasized, reassignment is an "extraordinary power and should be rarely invoked . . . . [R]eassignments should be made infrequently and with the greatest reluctance." *Armco, Inc. v. United Steel Workers of America, AFL-CIO, Local 169*, 280 F.3d 669, 683 (6th Cir. 2002); *see also Hamad v. Woodcrest Condominium Ass'n*, 328 F.3d 224, 238 (6th Cir. 2003). In determining whether reassignment is necessary, courts consider (1) whether the original judge would reasonably be expected to have substantial difficulty in putting out of his mind previously expressed views or findings; (2) whether reassignment is advisable to preserve the appearance of justice; and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness. *See Bercheny v. Johnson*, 633 F.2d 473, 476-77 (6th Cir. 1980).

The Plaintiffs argue that the district judge in this case failed to consider and/or mischaracterized the Plaintiffs' evidence regarding Richard Sagan's pulmonary and respiratory injuries, that he determined the issue of proximate cause based upon his own predetermined beliefs on quadriplegia, and that he was so partial to defendant United States that he initially decided that the Coast Guard had not been negligent

in its rescue operation. We agree that the district judge mischaracterized the Plaintiffs' evidence when he stated that the expert medical testimony in this case was "no more than conjecture or speculation." *Sagan v. United States*, 157 F. Supp. 2d at 829. Accordingly, we have reversed the district court's grant of summary judgment for defendant United States and remanded the case for further proceedings. On remand, the district court will reconsider all of the expert testimony in the record. We do not think that the district court's mischaracterization of the evidence is grounds for reassignment. If we reassigned the case every time a district court judge misconstrued some evidence, reassignment would surely cease to be "an extraordinary power . . . rarely invoked." *Armco*, 280 F.3d at 683. At oral argument in this case, counsel for the Plaintiffs was asked to provide the court with some limiting principle that would justify reassignment here but not in most other cases in which we reverse a district court's grant of summary judgment. Plaintiffs' counsel was unable to suggest any appropriate limiting principle, and we cannot think of one.

Turning to the Plaintiffs' other arguments, we do not agree that the district court determined the issue of proximate cause based upon its own predetermined beliefs on quadriplegia. The Plaintiffs base this argument on an exchange between Plaintiffs' counsel and the district court, during which the district judge stated that quadriplegia is an "irreversible condition" and that "[w]e still haven't found a way to cure somebody from being a quadriplegic." Appellants' Br. at 46; J.A. at 1039-40 (Transcript of Summary Judgment Motion Hearing). Based on this exchange, the Plaintiffs argue that the district judge in this case "allowed his own preconceptions of quadriplegia to interfere with his judgment of the injuries suffered by Mr. Sagan." Appellants' Br. at 48.

We note initially that the Plaintiffs provide no evidence that the district judge's statements about quadriplegia were incorrect. More importantly, we find no evidence that the district judge here allowed these "predetermined beliefs" to

influence his decision granting summary judgment for the United States. The district court's grant of summary judgment was not based on the irreversible nature of quadriplegia. Rather, the district court granted summary judgment for the United States because it found that the Plaintiffs had not introduced evidence sufficient to create a genuine issue of material fact with respect to proximate cause.

We also reject the Plaintiffs' argument that the district judge decided that the Coast Guard had not been negligent, and that this determination represents bias. The Plaintiffs base this argument on a different exchange between Plaintiffs' counsel and the district court, during which the district judge stated: "I think there are real problems here. I would like to know . . . what evidence there is here that . . . these defendants did not act with reasonable care in light of the extremely unique circumstances of this rescue that was performed." Appellants' Br. at 49; J.A. at 1020 (Transcript of Summary Judgment Motion Hearing).

This statement hardly amounts to a determination that the Coast Guard was not negligent. We do not think it is improper for a district judge, in a summary judgment motion hearing, to ask Plaintiffs' counsel what evidence he has that the Defendants did not act with reasonable care. We find in this statement by the district court nothing inappropriate or suggestive of bias. *See Hamad*, 328 F.3d at 239 (finding that remarks by the district judge, when considered in context, did not demonstrate that he was partial or that he could not put aside his personal views); *Brown v. Crowley*, 312 F.3d 782, 791-92 (6th Cir. 2003) (rejecting a request for reassignment despite plaintiff's claim that "[t]he district court seemed to [analyze] everything in favor of the defendants"). On remand, the district court will consider fully the issue of the Coast Guard's negligence.

For these reasons, we hold that reassignment of this case to another district court judge is not necessary.

### III. CONCLUSION

For these reasons, we **REVERSE** the district court's grant of summary judgment for the United States and **REMAND** the case for further proceedings, with the Plaintiffs' claims against the other Defendants reinstated.