Alfreda **KECK** and Devon Keck, Plaintiffs,

v.

**GRAHAM HOTEL SYSTEMS, INC., Defendant.**

**Case No. 07–CV–11042–DT.**

United States District Court, E.D. Michigan, Southern Division.

July 2, 2008.

Stephen M. Dane, Relman and Dane, PLLC, Washington, DC, Paul A. Callam, Ann Arbor, MI, for Plaintiffs.

Janice G. Hildenbrand, Collins, Einhorn, Southfield, MI, for Defendant.

## OPINION AND ORDER GRANTING "DEFENDANT'S MOTION FOR SUMMARY JUDGMENT"

ROBERT H. CLELAND, District Judge.

On March 12, 2007, Plaintiffs Alfreda Keck and Devon Keck, an African–American couple, filed a complaint against Defendant Graham Hotel Systems, Inc. in

this court, alleging race discrimination in violation of 42 U.S.C. § 1981 and the Elliott–Larsen Civil Rights Act ("ELCRA"), Mich. Comp. Laws § 37.2302. Specifically, Plaintiffs claim that Defendant refused to enter into a contract with Plaintiffs because of their race, and Plaintiffs were therefore unable to hold their wedding reception at Defendant's hotel, the Kensington Court Hotel ("Kensington Court").

Pending before the court is "Defendant's Motion for Summary Judgment." This motion has been fully briefed and the court concludes that a hearing on the motion is not necessary. *See* E.D. Mich. LR 7.1(e)(2). For the reasons stated below, the court will grant the motion.

## I. BACKGROUND

On July 14, 2004, Defendant terminated its relationship with Intercontinental Group and began operating the Crowne Plaza Hotel itself, renaming it Kensington Court. (Cebulski[1] Aff. at ¶ 2–5, Def.'s Ex. 1.) Angela Dietrich was Defendant's wedding coordinator and had the sole authority to enter into a contract for a wedding reception. (Cebulski Dep. at 21–22, Def.'s Ex. 2.) She held this position until she resigned effective August 13, 2004. (Resignation Form, Def.'s Ex. 5.) Allie Licht was Defendant's special events coordinator, and she was on vacation from August 13, 2004 to August 31, 2004. (Vacation Form, Def.'s Ex. 4.) When she returned from vacation, Licht took over Dietrich's responsibilities and became the new wedding coordinator. (Cebulski Dep. at 24, Def.'s Ex. 2.)

Viewing the facts in the light most favorable to Plaintiffs, they decided to get married in June 2004 and visited the hotel at that time. (Alfreda Dep. at 8, 35–37, 50–51, Pls.' Ex. 1.) Between that first initial visit and September 21, 2004, when Plaintiffs decided to hold their wedding reception at Crystal Gardens and signed a contract with them, Plaintiffs visited Kensington Court five times without an appointment, called or received calls from Defendant four times and received one fax from Defendant. (*Id.* at 58–66, 80–85, 107–115, 127, 133.) At no time did Plaintiffs actually speak to either Licht or Dietrich when either one of them held the position of wedding coordinator. (*Id.* at 60–61, 68–70.) During each of Plaintiffs' visits, they spoke to, and were helped by, other members of Defendant's catering and sales department. Most of these interactions were pleasant,[2] and Plaintiffs were allowed to tour the hotel and receive information about the facilities and amenities provided, including a fax about menu options. (*Id.* at 58–66, 80–85, 107–115, 127, 133.) Additionally, Plaintiffs were given two ten-day holds for their requested wedding date. (Maynie[3] Dep. at 17, Def.'s Ex. 3; Devon Dep. at 51, Pls.' Ex. 2.) On multiple occasions, Plaintiffs requested an appointment with the wedding coordinator and were told that the wedding coordinator would contact them, but other than one missed

---

1. Erin Cebulski is the Director of Sales and Marketing at the Kensington Court.

2. On one occasion, Alfreda felt that one of Defendant's employee's body language indicated that "she didn't like what she saw ... [s]he looked at me as if ... she saw my color before she knew anything about what I was there for." (Alfreda Dep. at 133, Pls.' Ex. 1.) During another visit, Plaintiffs were invited to sit and talk in the lobby of the hotel rather

than a private office, which Alfreda felt was a slight. (*Id.* at 86–87.) Nonetheless, Devon stated that there were "positive people that I interacted with," and it was their inability to sign a contract, not the way the staff treated them, that made the process a "nightmare" and discriminatory. (Devon Dep. at 44–45, Pls.' Ex. 2.)

3. Bridget Maynie was a Catering Manager at the Kensington Court.

call while Plaintiffs were on vacation, this never occurred. (Alfreda Dep. at 60–61, 68–70.) Because Plaintiffs never met with anyone who had the authority to enter into a contract with Plaintiffs, they did not book the Kensington Court for their wedding reception, despite being willing to do so.

On September 29, 2004, Alfreda filed a complaint with the Fair Housing Center of Southeastern Michigan ("FHC")[4]. (FHC Intake Form, Def.'s Ex. 18.) The FHC conducted four tests to determine whether Defendants would treat the African–American test couples differently than the Caucasian test couples. (Test Docs., Def.'s Ex. 19–22.) Out of those four tests, the FHC opined that one of them showed no significant differences between the way the two test couples were treated and three of them showed evidence of discriminatory differences in treatment. (*Id.*) Plaintiffs filed their complaint in this court on March 12, 2007, alleging race discrimination in violation of § 1981 and the ELCRA.

## II. STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). "In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir.2003). "Where the moving party has carried its burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the non-moving party, do not raise a genuine issue of material fact for trial, entry of summary judgment is appropriate." *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir.1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

The court does not weigh the evidence to determine the truth of the matter, but rather, to determine if the evidence produced creates a genuine issue for trial. *Sagan*, 342 F.3d at 497 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The moving party must first show the absence of a genuine issue of material fact. *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir.2000) (citing *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548). The burden then shifts to the nonmoving party, who "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). They must put forth enough evidence to show that there exists a genuine issue to be decided at trial. *Plant*, 212 F.3d at 934 (citing *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505). Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505 (1986).

The existence of a factual dispute alone does not, however, defeat a properly supported motion for summary judgment— the disputed factual issue must be material. *See id.* at 252, 106 S.Ct. 2505 ("The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that

---

4. The Fair Housing Center of Southeastern Michigan, is, according to its website, a "private, non-profit civil-rights agency dedicated to ending illegal housing discrimination."

Fair Housing Center of Southeast Michigan, http://www.guidestar.org/pqShowGsReport. do?partner=networkforgood&npoId=428059 (last visited June 30, 2008).

the plaintiff is entitled to a verdict—'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed.'" (alteration in original) (citation omitted)). A fact is "material" for purposes of summary judgment when proof of that fact would establish or refute an essential element of the claim or a defense advanced by either party. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir.1984) (citation omitted).

## III. DISCUSSION

■ In Count I of their Complaint, Plaintiffs allege that Defendant "denied Plaintiffs the same right to enter a contract as is enjoyed by white citizens." (Pls.' Compl. at ¶ 16.) Section 1981 prohibits intentional race discrimination in the making and enforcing of contracts with both public and private actors. 42 U.S.C. § 1981. The statute's protection extends to "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). A plaintiff asserting a § 1981 claim must prove intentional discrimination. *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 870 (6th Cir.2001) (citing *Gen. Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 389, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982)).

In Count II, Plaintiffs allege that Defendant violated the ELCRA, which provides that:

Except where permitted by law, a person shall not ... [d]eny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public service

because of religion, race, color, national origin, age, sex, or marital status.

Mich. Comp. Laws § 37.2302(a). The ELCRA defines a "place of public accommodation" as:

a business, or an educational, refreshment, entertainment, recreation, health, or transportation facility, or institution of any kind, whether licensed or not, whose goods, services, facilities, privileges, advantages, or accommodations are extended, offered, sold, or otherwise made available to the public.

Mich. Comp. Laws § 37.2301(a). "The same race-discrimination framework can be used to examine both Plaintiff[s'] Section 1981 and Elliott–Larsen claims. The Sixth Circuit has explained that both types of cases call for the same race-discrimination analysis as is conducted under Title VII." *Diaz v. City of Inkster*, No. 05–70423, 2006 WL 2192929, at *8 (E.D.Mich. Aug. 2, 2006) (citing *Sutherland v. Michigan Dep't of Treasury*, 344 F.3d 603, 614 n. 4 (6th Cir.2003); *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021, n. 2 (6th Cir.2000); *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir.1992)). Therefore, the court will analyze both claims together.

Absent direct evidence of race discrimination,[5] "a plaintiff must meet the burden-shifting standard of proof of Title VII cases established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Christian*, 252 F.3d at 872–73. Under this framework, Plaintiffs have the initial burden of presenting a *prima facie* case of discrimination. *McDonnell Douglas Corp.*, 411 U.S. at 802, 93 S.Ct. 1817. The establishment of a *prima facie* case creates a rebuttable presumption of discrimination and creates a burden of production for Defendant to articulate a legiti-

---

**5.** Plaintiffs have not submitted direct evidence of discrimination.

mate non-discriminatory reason for taking the challenged action. *Id.* Defendant's burden after a *prima facie* case is presented is only one of production, not persuasion; the ultimate burden of persuasion remains with Plaintiffs. *Id.* at 803, 93 S.Ct. 1817. Once Defendant offers a legitimate non-discriminatory reason, Plaintiffs bear the burden to prove that such reason is a pretext for discrimination. *Id.* at 804, 93 S.Ct. 1817.

■ In order to state a *prima facie* case of race discrimination under 42 U.S.C. § 1981 in a commercial establishment case, a plaintiff must prove the following:

(1) plaintiff is a member of a protected class;

(2) plaintiff sought to make or enforce a contract for services ordinarily provided by the defendant; and

(3) plaintiff was denied the right to enter into or enjoy the benefits or privileges of the contractual relationship in that (a) plaintiff was deprived of services while similarly situated persons outside the protected class were not and/or (b) plaintiff received services in a markedly hostile manner and in a manner which a reasonable person would find objectively discriminatory.

*Christian*, 252 F.3d at 872.

It is undisputed that Plaintiffs are African–American and are therefore members of a protected class. Plaintiffs also claim that they have met the second prong of their *prima facie* test because they repeatedly told Defendant that they were willing and able to enter into a contract to rent space for their wedding reception, a service ordinarily provided by Defendant. Defendant does not dispute this claim. Therefore, Plaintiffs have satisfied the first and second elements of their *prima facie* case.

Plaintiffs may satisfy the third prong in one of two ways. First, they may show that they were "deprived of services while similarly-situated persons outside the protected class were not." *Id.* Plaintiffs claim that, despite their "ability and willingness to pay and sign a reservation, each time the Kecks asked to pay their deposit or sign a contract, they were told they could not do so." (Pls.' Resp. at 4.) Plaintiffs were able to view the facilities and were giving two ten-day holds for their wedding date. (Maynie Dep. at 17, Def.'s Ex. 3; Devon Dep. at 51, Pls.' Ex. 2.) However, Defendant's wedding specialist was the only person able to enter into a reservation contract with Plaintiffs, and Plaintiffs were never able to meet with the wedding specialist personally, despite requesting to do so. (Alfreda Dep. at 60–61, 68–70, Pls.' Ex. 1.)

Viewing these facts in the light most favorable to Plaintiffs, a reasonable jury could conclude that Plaintiffs were deprived of the ability to enter into a contract with Defendant to rent their facilities for Plaintiffs' wedding reception. This, however, is not sufficient to make out Plaintiffs' *prima facie* claim of race discrimination. Plaintiffs must show that Defendant did not enter into a contract with them *because of their race* by showing that they were "deprived of services *while similarly-situated persons outside the protected class were not.*" *Christian*, 252 F.3d at 872 (emphasis added). Plaintiffs attempt to do so by claiming that Defendant could only point to one African–American wedding out of hundreds held at Kensington Court after July 2004, when Defendant ceased its affiliation with Crowne Plaza. (Pls.' Resp. at 7–8.)

Defendant, perhaps understandably, does not keep records of their clients' race. (Def.'s Resp. to Prod. Req. at ¶ 16, Pls.' Ex. 16.) Therefore, Defendant's own doc-

uments cannot shed light on the number of African–American couples who booked receptions at Kensington Court. Defendant did, however, search through "the *Ann Arbor News* for wedding notices of couples who were married or held their receptions at the Kensington Court." (Hagen [6] Aff. at ¶ 2, Def.'s Ex. 7.) This search revealed only nine wedding notices, one [7] of which depicted an African–American couple. (*Id.* at ¶ 5.) Plaintiffs impliedly ask the court to assume that, because Defendant identified one African–American couple, there was in fact only one Kensington Court reception involving an African–American couple over an approximately three-year period. (Pls.' Resp. at 7–8.) An assumption of this sort cannot hold.

First, identifying one African–American couple out of nine couples who mentioned the Kensington Court in their Ann Arbor News wedding announcement is of little if any relevance to the similarly-situated component of Plaintiffs' *prima facie* case. Second, the focus should not be on how many couples within the protected class booked their wedding receptions at the Kensington Court, but whether other couples not in the protected class who booked a reception were both similarly situated to Plaintiffs and treated differently. Third, Plaintiffs misunderstand the parties' burdens of proof. It is not, as Plaintiffs intimate, Defendant's burden to show that it treated similarly-situated couples in a like fashion. Instead, faced with a motion for summary judgment, Plaintiffs must identify sufficient facts in the record necessary to support their *prima facie* case, including that similarly-situated couples of a different race were treated differently than they were. *See Christian*, 252 F.3d at 872. Plaintiffs have failed to do so here.[8]

Under the facts in evidence here, there was one African–American couple out of nine couples identified by their race in the *News*. This constitutes eleven percent of that very small sample. The sample, in turn, constitutes less than five percent of the wedding receptions the parties estimate were held in Kensington Court during the relevant three-year period.[9] The court agrees that the mere "existence of Caucasian wedding receptions at Kensington Court does not satisfy the similarly situated element." (Def.'s Reply at 1–2.)

 Further, Plaintiffs have not addressed at all the temporal aspect of what would be required to identify similarly-situated couples. Important among the undisputed facts here is that during the approximately 90 days between Plaintiffs' first drop-in visit to the hotel (in mid-June) and their decision to abandon their attempt to obtain further information and a possible booking (by mid-September), the hotel changed ownership in mid-July, the former wedding coordinator resigned about 30 days later in mid-August and the replacement wedding coordinator was absent for the succeeding two weeks until

---

**6.** Laurie Hagen is a paralegal at Collins, Einhorn, Farrell & Ulanoff, the law firm representing Defendant.

**7.** Although Defendant claims that there were two such wedding notices, one of the weddings was held on June 28, 2003, when the hotel was still a Crowne Plaza hotel. (Hagen Aff. at ¶ 5, Def.'s Ex. 7.)

**8.** For example, Plaintiffs could have, but did not, request from Defendant the names of couples who booked the Kensington Court for their receptions during the relevant time period and attempt to determine the race of each couple and the circumstances surrounding their interactions with Defendant.

**9.** There were sixty-five wedding receptions held at Kensington Court in the year 2005 alone. (Def.'s Initial Disclosures, Pls.' Ex. 10.)

early September; she was then "swamped" with backlogged reservations-related work for weeks after her return. Plaintiffs themselves were apparently unavailable for phone contact during at least some of that time as well. The court has been presented nothing about the treatment of potentially similarly-situated couples *during the critical time,* and Plaintiffs have therefore not shown that any such couples were indeed similarly-situated. Viewing the undisputed facts in the light most favorable to Plaintiffs, the court cannot determine that Plaintiffs have met their burden to establish that they were treated differently from any similarly-situated non-protected couples.

Nor can Plaintiffs satisfy the third prong of their *prima facie* case by showing that they "received services in a markedly hostile manner and in a manner which a reasonable person would find objectively discriminatory." *Christian,* 252 F.3d at 872. Relevant factors "include whether the conduct 'is (1) so profoundly contrary to the manifest financial interests of the merchant and/or her employees; (2) so far outside of widely-accepted business norms; and (3) so arbitrary on its face, that the conduct supports a rational inference of discrimination.' " *Id.* at 871 (quoting *Callwood v. Dave & Buster's, Inc.,* 98 F.Supp.2d 694, 705 (D.Md.2000)). Plaintiffs claim that Defendant's failure to contact Plaintiffs and enter into a contract with them meets this test. (Pls.' Resp. at 9.) Defendant, however, argues that "[P]laintiffs were not denied the right to hold their wedding reception at Kensington Court. At the time of [P]laintiffs' last contact with the hotel they were afforded a second, ten day hold for the proposed wedding date." (Def.'s Mot. at 3.) Further, Defendant points out the undisputed fact that "[o]n the last day that ten day hold would have been effective, September 21,

2004, Plaintiff Alfreda Howard entered into a contract with another facility and placed a deposit." (*Id.*) Plaintiffs do not allege that Defendant affirmatively refused to enter into a contract with Plaintiffs. Instead, Plaintiffs contend that Defendant did not contact them during the ten-day hold period in order to enter into a contract with Plaintiffs. While Defendant's failure to follow up on Plaintiffs' stated intent to reserve the Kensington Court for their wedding reception is contrary to their financial interests, it is insufficient evidence for a reasonable jury to find that this lack of attentiveness is either "so far outside of widely-accepted business norms" or "so arbitrary on its face, that the conduct supports a rational inference of discrimination." *Christian,* 252 F.3d at 871.

Even if Plaintiffs had established a *prima facie* case of race discrimination, summary judgment would still be appropriate because Defendant has proffered the following legitimate, nondiscriminatory reasons for Plaintiffs' difficulty in obtaining a contract: (1) the hotel's name change prevented Defendant from providing wedding brochures with the Kensington Court name; (2) Defendant's Special Events Manager Angela Dietrich resigned on August 13, 2004; (3) Defendant's Special Events Coordinator Allie Licht was on vacation from August 13, 2004 until August 31, 2004, and, upon her return, Licht had too many inquiries to catch up on for her to do so in a timely manner; and (4) Plaintiffs' visits to the Kensington Court were not arranged beforehand, but were instead walk-in visits that were typically during lunch or on weekends when staffing levels were low. (Def.'s Mot. at 5–6.) Therefore, Defendant acknowledged that, under these "unusual circumstances," Defendant may have provided "less than the high level of service usually provided by Kensington Court Hotel." (*Id.* at 6.)

In order to defeat a motion for summary judgment once Defendant articulates its legitimate nondiscriminatory reasons, it is incumbent on Plaintiffs to show that the proffered reasons were pretextual. *See Godfredson v. Hess & Clark,* 173 F.3d 365, 373 (6th Cir.1999). Plaintiffs can do so "by showing that (1) the stated reasons had no basis if fact; (2) the stated reasons were not the actual reasons; and (3) that the stated reasons were insufficient to explain the defendant's action." *Christian,* 252 F.3d at 879 (quoting *Johnson v. Univ. of Cincinnati,* 215 F.3d 561, 573 (6th Cir. 2000)).

■ Plaintiffs attempt to show pretext in two ways. First, although Plaintiffs largely accept Defendant's proffered reasons as based in fact, Plaintiffs claim that Defendant's non-discriminatory "justification is insufficient to compel summary judgment in the Hotel's favor." (Pls.' Resp. at 10.) Specifically, Plaintiffs argue that Dietrich's resignation and Licht's vacation only accounted for a portion of the period in which Plaintiffs attempted to discuss their wedding plans with Defendant. (*Id.*) Yet Plaintiffs do not deny the following facts: (1) that the transition from the Intercontinental Group's Crowne Plaza to Kensington Court under Defendant's sole management took place in the middle of July; (2) no wedding coordinator was able to contact Plaintiffs in August due to resignations and vacations (including Plaintiffs' own vacation); and (3) in September, Licht was overwhelmed with work that had accumulated during her absence. Furthermore, Plaintiffs do not contest that the staff available during that time were, for the most part, helpful and nice, and responded to all of Plaintiffs' requests except their request to sign a contract, something only the wedding coordinator could do. Plaintiffs have simply failed to provide any evidence that Defendant's lack of attentiveness or follow-through was because of Plaintiffs' race as opposed to Defendant's asserted—indeed, proven—extraordinary corporate transition and staffing replacement circumstances during that summer.

Second, Plaintiffs rely on the FHC's test to establish pretext. The court is unaware, however, of any court that has allowed a plaintiff to use testing evidence in this manner. Plaintiffs cite cases in which testing evidence has been admitted and considered during trial or for a motion for preliminary injunction in housing discrimination cases,[10] but testing evidence appears not to have been used, by itself, at the summary judgment stage in an attempt to establish pretext after the defendant rebutted the plaintiff's *prima facie* claim of race discrimination under § 1981 or ELCRA.[11]

---

**10.** For example, in *Paschal v. Flagstar Bank, FSB,* 295 F.3d 565, 580 (6th Cir.2002), the Sixth Circuit affirmed the district court's evidentiary ruling, which allowed testing evidence to be presented at trial. In an order awarding damages, another court in this district referred to reports from testers being admitted at trial as business records. *Laudon v. Loos,* 694 F.Supp. 253 (E.D.Mich.1988). In *Zuch v. Hussey,* 394 F.Supp. 1028, 1051 (E.D.Mich.1975), another court in this district considered testing evidence in ruling on a motion for preliminary injunction.

**11.** In *Reeves v. Rose,* 108 F.Supp.2d 720 (E.D.Mich.2000), the court commented that "evidence resulting from the experience of testers is admissible to show discriminatory conduct on defendant's part," *id.* at 728 (citing *Zuch v. Hussey,* 394 F.Supp. 1028, 1051 (E.D.Mich.1975)), and found that testing evidence developed during a relevant time period could be used to establish a prong of the plaintiff's housing discrimination *prima facie* case, albeit one that is not relevant here. Shortly after a landlord's agent refused to rent the apartment to the racial-minority plaintiff, the landlord was willing to rent the apartment to a white tester while being simultaneously unwilling to rent to both a minority tester and a white tester. This, the *Reeves*

Additionally, even in a light favorable to Plaintiffs, the testing evidence showed only minor inconsistencies in the information shared with, and accommodations given to, the individual test couples. When the four tests are viewed as a whole, there was no information or accommodation that was provided to the Caucasian couples but was not provided to any African–American couple.

The FHC identified the following as evidence that, it suggests, indicates that Defendant discriminated against the protected testers: (1) one of the protected test couples was told no one was available to meet with them; (2) another protected couple was not invited to view a wedding when the comparison couple was; (3) other protected testers were not offered a ten-day hold when the comparison testers were; (4) one protected couple was not offered coffee when the other comparison tester was; (5) one protected test couple waited fifteen minutes for assistance while the comparison testers did not have to wait during their visit; (6) one protected couple was not able to meet with the wedding planner although the comparison couple who visited the hotel a few days earlier was able to; and (7) a protected couple was told of the $12,000 minimum when the comparison couple was not. (Test Docs., Def.'s Ex. 19–22.)

Although differences were identified between some of the test couples, several of them are trivial in light of other acknowledged circumstances, and none of the differences hold true when all four tests were viewed as a whole.

Firstly, the protected couple that was told no one was immediately available admittedly received a return phone call the same day; the protected couple not offered coffee was there in the afternoon while the couple that was offered coffee was there in the morning; the protected couple who had to wait an insignificant few minutes was there in the morning while the couple who experienced no wait was there in the afternoon. (Id.)

Secondly, it is undisputed that some of the African–American couples were seen immediately although others were not. (Id.) Not all of the Caucasian couples were offered coffee, ten-day holds or the opportunity to view another wedding. (Id.) Not all of the Caucasian couples met with the wedding coordinator and some of the African–American couples did. (Id.) One Caucasian couple was told of the $12,000 minimum and not all of the African–American couples were told of the minimum. (Id.) Furthermore, all of the essential terms were identical. The test couples were given the same available dates and the pricing information did not change based on the race of the couple. (Id.) Most significantly, however, none of the tests shed any light at all on the essence of Plaintiffs' claim, which is that they were denied the ability to enter into a contract because of their race. None of the testers actually requested a contract. Each tester merely expressed interest in the Kensington

court held, could establish the fourth element of Plaintiff's *prima facie* case, "that the housing or rental property remained available after rental was denied them." *Id.* Additionally, one Ninth Circuit case considered testing evidence in conjunction with a discriminatory statement and found that summary judgment was inappropriate on the issue of pretext. *See Harris v. Itzhaki,* 183 F.3d 1043, 1052 (9th Cir.1999). However, testing evidence has been rejected as the *sole* basis for direct evidence of discrimination in an unpublished Eastern District of Michigan case. *Jackson v. Whitehouse,* No. 92–74725, 1993 WL 1624960, at *6 (E.D.Mich. Nov. 23, 1993) ("Even if the Court were to take the tester reports as evidence of discrimination, such a finding would not excuse Plaintiffs from showing that they themselves were victims of discrimination.").

Court as a potential location for a wedding reception and received information and sometimes offers for a ten-day hold, all things that Plaintiffs readily admit that they, too, were offered. No test couple asked for and were offered or asked for and were denied a contract. Finally, as noted above, none of these tests were undertaken during the period in which Plaintiffs interacted with Defendant. Properly constructed testing can be useful and admissible evidence in some instances, especially housing discrimination, to prove discriminatory conduct. *See Reeves*, 108 F.Supp.2d at 728. Indeed, in some circumstance it may be quite powerful. The testing evidence proffered within the unusual facts of this case, however, was conducted outside the scope of the significant time period, is at best equivocal and is ultimately irrelevant. It cannot serve to demonstrate that Defendant was using its tumultuous and admittedly unique business circumstances during that period as a mere pretext for discrimination.

Accordingly, Plaintiffs have failed to proffer sufficient evidence to create a genuine question of material fact to rebut Defendant's proffered legitimate and non-discriminatory reasons for providing "less than the high level of service usually provided by Kensington Court Hotel" (Def.'s Mot. at 6), a situation that resulted in Plaintiffs not being offered a contract.

### IV. CONCLUSION

IT IS ORDERED that Defendant's "Motion for Summary Judgment" [Dkt. # 11] is GRANTED.