RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 09a0181p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

—————————————

ALFREDA KECK and DEVON KECK,
   *Plaintiffs-Appellants,*

   *v.*

GRAHAM HOTEL SYSTEMS, INC.,
   *Defendant-Appellee.*

No. 08-2024

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 07-11042—Robert H. Cleland, District Judge.

Argued: April 29, 2009

Decided and Filed: May 21, 2009

Before: MERRITT, COOK, and WHITE, Circuit Judges.

—————————————

**COUNSEL**

**ARGUED:** Stephen M. Dane, RELMAN & DANE, Washington, D.C., for Appellants. Deborah A. Hebert, COLLINS, EINHORN, FARRELL & ULANOFF, Southfield, Michigan, for Appellee. **ON BRIEF:** Stephen M. Dane, RELMAN & DANE, Washington, D.C., for Appellants. Deborah A. Hebert, Janice G. Hildenbrand, COLLINS, EINHORN, FARRELL & ULANOFF, Southfield, Michigan, for Appellee.

—————————————

**OPINION**

—————————————

MERRITT, Circuit Judge. Plaintiffs, Alfreda and Devon Keck, sued the defendant, Graham Hotel Systems, Inc., alleging race discrimination in violation of 42 U.S.C. § 1981 and the Elliot-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2302. Specifically, the plaintiffs alleged that the defendant refused to host their wedding reception at its hotel because they are African American.

1

The plaintiffs appeal the District Court's June 30, 2008, opinion and order granting the defendant's motion for summary judgment. *Keck v. Graham Hotel Sys., Inc.*, 563 F. Supp. 2d 733 (E.D. Mich. 2008). There is no issue in this case regarding the standard of review of a summary judgment. We review the summary judgment de novo but the court's findings of specific facts for clear error. The District Court is required to interpret facts in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). We conclude that the District Court did not so interpret the facts and that a material dispute of fact exists requiring the reversal of summary judgment.

## I. THE PLAINTIFFS' FACTUAL CLAIMS

The defendant owns and operates the Kensington Court Hotel (the "Hotel") in Ann Arbor, Michigan. The Hotel was formerly known as the Crowne Plaza Hotel pursuant to a franchise agreement with Intercontinental Hotel Group. The franchise agreement ended on July, 14, 2004, and the Hotel's name was thereafter changed. But the record is clear that, despite the new name, there was no attendant change in the Hotel's ownership, management, or staffing.

The Hotel rents out its banquet space. These events are handled by the Hotel's Catering and Sales Department, but only the Hotel's Wedding Specialist is permitted to secure contracts for wedding receptions. Contracts for wedding receptions called for a $12,000 food and beverage minimum, with a $1,200 deposit to be paid upfront. During the course of the plaintiffs' contact with the Hotel, there were two Wedding Specialists, Angela Dietrich and Allie Bratton. Dietrich was the Wedding Specialist until her resignation on August 13, 2004. She was succeeded by Bratton on August 31, 2004. Between August 13 and August 31, the Hotel had no Wedding Specialist.

### A. Contacts With The Hotel

In the summer of 2004, the plaintiffs decided to marry. They tentatively settled on a wedding date of October 8, 2005, in Ann Arbor, Michigan, where Mrs. Keck lived. Because Mr. Keck was living in Philadelphia, Pennsylvania, at the time, Mrs. Keck did much of the wedding-related work alone. Nevertheless, Mr. Keck made several weekend visits to

Ann Arbor and, when present, accompanied Mrs. Keck on visits to potential wedding reception venues.

The plaintiffs began looking for venues during a weekend visit by Mr. Keck in June 2004. During the visit, the plaintiffs stopped by the Hotel (then operating as the Crowne Plaza), looked around the facilities, and spoke to an employee at the front desk about wedding receptions at the Hotel. Based on what they saw and heard, they decided to have their reception at the Hotel and filled out an official "Sales & Catering Walk-In Inquiry Form" for the Wedding Specialist. On the form, the plaintiffs listed their names and phone numbers, a desired wedding reception date in October 2005, and estimated the number of attendees to be 150 to 200.

No one from the Hotel responded to the Inquiry Form. Mrs. Keck attempted to contact the Wedding Specialist. Throughout late June and early July, she left several telephone messages, made two walk-in visits to the Hotel, and filled out a second Inquiry Form at the front desk. Still the Wedding Specialist did not respond. Several weeks later on July 21, a subordinate in the Catering and Sales Department contacted Mrs. Keck to inform her that the Wedding Specialist was currently on vacation. The Catering and Sales Department also faxed a copy of the Hotel's food and beverage options for receptions to Mrs. Keck at her request.

Mr. Keck made another trip to Ann Arbor at the end of July and, on July 30, the plaintiffs visited the Hotel again. Upon arrival, they were informed that the Wedding Specialist was not in, but were given a tour of the reception hall, honeymoon suite, and guest rooms by the Restaurant Manager. At the end of the visit, the plaintiffs repeated their interest in booking the Hotel for their reception and again requested an appointment with the Wedding Specialist. The Wedding Specialist did not respond. Instead, in mid-August, while the plaintiffs were on vacation, a subordinate left a telephone message stating only that the plaintiffs' desired date was still available. Mrs. Keck returned from vacation on August 19 and immediately returned the call. Although unable to speak to the Wedding Specialist, Mrs. Keck secured a ten-day hold on her desired reception date, but the hold expired without a return call from the Hotel.

In early September, Mrs. Keck attempted to arrange a meeting with the new Wedding Specialist, Ms. Bratton, to coincide with an upcoming visit by Mr. Keck. She decided to visit the hotel in person to make the arrangements, but before doing so, she called ahead to ensure that the Wedding Specialist would be in. After being told that the Wedding Specialist was in, Mrs. Keck proceeded to the Hotel and requested to speak to Ms. Bratton, asking for her by name. An employee at the front desk responded that Ms. Bratton would be right with her and asked Mrs. Keck to wait in the lobby. After waiting for nearly an hour, Mrs. Keck returned to the front desk to inquire about Ms. Bratton and was informed that she had since left for the day.

Mr. Keck arrived from Philadelphia the following week, and the couple visited the Hotel on Friday, September 10. Upon arrival, they asked an attendant at the front desk to see the Wedding Specialist. The attendant then called the Catering and Sales Department and, after exchanging a few words over the telephone, told the plaintiffs that the Wedding Specialist was in but could not see them without an appointment. The plaintiffs responded that they had been trying to schedule an appointment for weeks, but the attendant did not relent, and the plaintiffs left.

The plaintiffs returned to the Hotel for the final time on Saturday, September 11. When told that the Wedding Specialist was not in, the plaintiffs insisted on speaking to someone with authority. After several minutes, the Hotel's Director of Sales and Marketing emerged from her office to the crowded lobby where she spoke to them briefly (the plaintiffs attribute significance to the fact that they were forced to speak in the lobby, instead of being invited to the privacy of the Hotel office). The plaintiffs told the Director of their repeated attempts to meet with the Wedding Specialist and sign a contract, and asked to pay the deposit and to sign a contract for their reception that very day. The Director refused, explaining that only the Wedding Specialist had the authority to issue contracts. However, the Director put another ten-day hold on the plaintiffs' desired date and said that the Wedding Specialist would call them on Monday, September 13. The Wedding Specialist did not call and, for a second time, the ten-day hold expired without any contact from the Hotel. Now convinced after three months of effort that the Hotel was refusing to deal with them because of their race, the plaintiffs abandoned their efforts with the Hotel and sought out another venue.

The plaintiffs claim that, during this roughly three-month period in 2004, they made seven walk-in visits to the Hotel, left numerous telephone messages, filled out two Inquiry Forms, and placed two holds on their desired reception date. On three occasions, the plaintiffs offered in-person to pay the $1,200 deposit and to sign a contract for their desired date. And on two occasions, the Wedding Specialist was present but declined to speak with the plaintiffs — leaving while Mrs. Keck waited in the lobby the first time, and refusing to see the plaintiffs for want of an appointment the second time. Despite the plaintiffs' repeated overtures, they were never able to speak to the Wedding Specialist or permitted to pay the $1,200 deposit and sign a contract.

## B. Fair Housing Commission Testers

On September 29, 2004, Mrs. Keck filed a complaint about the Hotel with the Fair Housing Center of Southeastern Michigan. To investigate the claims, the Center sent four pairs of "testers" to the Hotel between October 2004 and August 2005. Each pair was alike except for race, with one tester being Caucasian and the other being African-American. Upon arrival at the Hotel, each tester inquired about having a wedding reception. Based on the Hotel's response, the Center classified the results of the "tests" in one of three ways: evidence of discriminatory differences in treatment; inconclusive; or no significant differences in treatment.

The first test took place on October 15, 2004. The African-American tester was unable to meet the Wedding Specialist, but was encouraged to fill out an Inquiry Form. The Caucasian tester was able to meet with the Wedding Specialist, offered a ten-day hold on her desired reception date, and invited to visit a wedding reception scheduled for the coming weekend. Based on the discrepancies, the test was classified as revealing evidence of discriminatory differences in treatment. The second test took place on June 14, 2005. The African-American tester had to wait fifteen minutes to see the Wedding Specialist and was eventually told to return with her fiancé. The Caucasian tester waited but two minutes and, as before, was invited to return to see a wedding that weekend. This test was classified as revealing evidence of discriminatory differences in treatment. The third test took place on July 26, 2005. The African-American tester was unable to meet with the Wedding Specialist and was told that there was a $12,000 food and beverage minimum for wedding receptions

at the Hotel.  The Caucasian tester met with the Wedding Specialist and was offered a ten-day hold on her desired reception date.  This test was classified as revealing evidence of discrimination.  The fourth and final test took place on August 12, 2005.  Both testers were able to meet with the Wedding Specialist, told of the deposit required, and given a list of available dates for receptions.   This test was classified as not revealing significant differences in treatment.

## II. DISTRICT COURT OPINION AND ORDER

The District Court began its analysis by holding that, because the plaintiffs offered no direct evidence of discrimination, their claims were subject to the burden shifting analysis of *McDonnell Douglas Corp v. Green*, 411 U.S. 792 (1973), as modified for § 1981 commercial establishment claims by *Christian v. Wal-Mart Stores, Inc.,* 252 F.3d 862 (6th Cir. 2001).[1]  Under this framework, to state a *prima facie* case of discrimination, the plaintiffs must show that: (1) they belonged to a protected class; (2) they sought to make a contract for services ordinarily provided by the defendant; and (3) they were denied the right to enter into a contract for such services while similarly situated persons outside the protected class were not, or they were treated in such a hostile manner that a reasonable person would find it objectively discriminatory.  *Id.* at 872.

The parties agreed that the plaintiffs met the first two requirements.  As to the third requirement, the District Court found that the plaintiffs did not show differing treatment from similarly situated non-protected couples.  *Keck*, 563 F. Supp. 2d at 740.  Although it was undisputed that the Hotel hosted weddings for Caucasian couples, the District Court ruled that there was no evidence about the treatment of such couples "*during the critical time*," presumably the three-month period when the plaintiffs were in contact with the Hotel.  *Id.*  (emphasis in original).  Additionally, the District Court ruled that the plaintiffs could not show that the Hotel provided services in a markedly hostile manner because it did not "affirmatively refuse[]" to enter into a contract with the plaintiffs, but only "fail[ed] to follow up." *Id.*

---

[1]The plaintiffs' Elliot-Larsen claims are analyzed under the same framework.  *See Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 614 n.4 (6th Cir. 2003).

The District Court also concluded that even if the plaintiffs had stated a *prima facie* case of discrimination, they could not rebut the Hotel's nondiscriminatory explanations for the plaintiffs' treatment based on the Hotel's name change, its temporary lack of a Wedding Specialist, and the unscheduled nature of the plaintiffs' visits. The plaintiffs responded that the explanations were insufficient to explain the Hotel's behavior, and added that the experiences of the Fair Housing Center testers further suggested that the explanations were pretextual. The District Court dismissed these responses, concluding that the Hotel had undergone an "extraordinary corporate transition" and that the testers revealed only "minor inconsistencies" in treatment. *Id.* at 741-42.

### III. DIFFERING TREATMENT

The parties agree that the plaintiffs' claims rely on evidence that is subject to the tripartite, burden-shifting standard articulated by this court in *Christian*, 252 F.3d at 872. This burden is not intended to be "onerous," *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981); rather, it should only "eliminate[] the most common nondiscriminatory reasons for the plaintiff's treatment." *Id.* at 253-54. Moreover, "the precise requirements of a *prima facie* case can vary depending on the context and were 'never intended to be rigid, mechanized, or ritualistic.'" *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002) (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978)).

An inference of discrimination arises where a plaintiff is deprived of services "while similarly situated persons outside the protected class were not." *Christian*, 252 F.3d at 872. In the commercial establishment setting, this test "is written with the understanding that 'the comparison will never involve precisely the same set of ... [conduct] occurring over the same period of time and under the same sets of circumstances.'" *Id.* at 871 (quoting in part *Callwood v. Dave & Buster's, Inc.*, 98 F. Supp. 2d 694, 707 (D. Md. 2000) (alterations in original)).

Although the Hotel does not dispute that it regularly entered into wedding reception contracts with Caucasians, it refused to disclose whether it did so during the

operative time period in this case.  During discovery, the plaintiffs requested documentation of all Hotel wedding contracts entered into between June 1 and October 31, 2004.  The Hotel refused, arguing that producing such materials was "overly burdensome," and that the request itself was "overbroad."  This District Court erred in its conclusion that the plaintiffs had not sought these records.  In finding that the plaintiffs failed to meet the differing treatment requirement, it commented that "Plaintiffs could have, but did not, request from Defendant the names of couples who booked the [Hotel] for their receptions during the relevant time period and attempt to determine the race of each couple and the circumstances surrounding their interactions with Defendant." *Keck*, 563 F. Supp. 2d at 739 n.8.

The Hotel's response is not well taken.  Such documents are crucial to the plaintiffs' case.  The refusal may lead to an adverse inference about the nature of such evidence. *See*, *e.g.*, *Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337, 1345 (Fed. Cir. 2004) (en banc) ("[A] party's refusal to . . . produce evidence in civil suits creates a presumption of an intent to withhold damaging information that is material to the litigation."); *Nat'l Ass'n of Radiation Survivors v. Turnage*, 115 F.R.D. 543, 557 (N.D. Cal. 1987) ("Where one party wrongfully denies another the evidence necessary to establish a fact in dispute, the court must draw the strongest allowable inferences in favor of the aggrieved party."); *Cecil Corley Motor Co. v. Gen. Motors Corp.*, 380 F. Supp. 819, 859 (M.D. Tenn. 1974) ("When a litigant . . . withholds records or documents while litigation is pending . . . the strongest inferences may be drawn against that party which the opposing evidence in the record permits.").

Thus the record is unclear about the wedding contracts made during the relevant time period.  One form shows that fifteen weddings were "booked" between July and August, 2004, but at oral argument, the Hotel claimed that "booking" meant the issuance of a ten-day hold, not an actual reception contract.  The meaning is uncertain.  Another document lists the Hotel's wedding receptions for the year 2005 and, in several cases, includes the "date booked."  Two of these weddings (Turpin/Balbach and Buter/Kruger)

were "booked" on September 20, 2004, during which time the plaintiffs still had a hold on their desired date, but the races of these couples is unknown.

From these documents, it is impossible to determine whether the plaintiffs were denied a wedding contract while similarly situated Caucasians were not. Answering this question requires only that the Hotel provide a list of people (if any) who signed wedding contracts between June 2004, and September 21, 2004, from which the plaintiffs could then determine if any were Caucasian. The Hotel refused to turn over the relevant documents and information. Indeed, when pressed on the subject at oral argument, counsel for the Hotel was unable to state whether such documents existed.

## IV. "MARKEDLY HOSTILE"

As an alternative to showing differing treatment, in the commercial establishment context, the plaintiffs can also establish a *prima facie* case of discrimination by showing that they received service in a "markedly hostile manner . . . [that] a reasonable person would find objectively discriminatory." *Christian*, 252 F.3d at 872. In determining whether a defendant's actions rise to the level of being markedly hostile, courts consider whether the conduct is: "'(1) so profoundly contrary to the manifest financial interests of the merchant and/or her employees; (2) so far outside of widely-accepted business norms; and (3) so arbitrary on its face, that the conduct supports a rational inference of discrimination.'" *Id.* at 871 (quoting *Callwood*, 98 F. Supp. 2d at 708).

The Hotel urges that this test cannot be met because its staff always treated the plaintiffs courteously and respectfully. But the present record would support a jury finding that, over a three-month period in 2004, the plaintiffs made numerous attempts to enter into a contract with the Hotel to host their wedding reception. To this end, the plaintiffs made numerous walk-in visits and telephone calls, filled out Inquiry Forms, put two separate ten-day holds on their desired reception date, and three times offered in-person to pay the $1,200 deposit and sign the contract, which would have required them to spend a minimum of $12,000 in food and beverages through the Hotel for the reception. Viewing these facts in the light most favorable to the plaintiffs, it is possible to construe the Hotel's complete failure to consummate the transaction as "'contrary to

[its] financial interests'" and "'outside of widely accepted business norms.'" *Christian*, 252 F.3d at 871 (quoting *Callwood*, 98 F. Supp. 2d at 708). This finding permits an inference of discrimination sufficient to state a *prima facie* case. *Id.* at 872.

## V. THE HOTEL'S NONDISCRIMINATORY JUSTIFICATIONS

The Hotel claims that its name change caused confusion and required the alteration of all signs and promotional materials containing the Crowne Plaza logo. The District Court accepted this justification as a basic reason for the Hotel's conduct. Specifically, the District Court found that the Hotel "changed ownership," underwent a "transition" in "management," and survived an "extraordinary corporate transition," all resulting in "tumultuous and admittedly unique business circumstances." *Keck*, 563 F. Supp. 2d at 739, 741, 743. The record below establishes that the termination of the franchise agreement did not result in any turnover in the Hotel's ownership, management, or lower-level staffing — a fact freely conceded by the Hotel during oral argument. The facts on this issue create a material issue of fact as to the reason for the Hotel's conduct.

The fact of the vacations and temporary lack of a Wedding Specialist also create a material issue for the jury because they account for but a small portion of the roughly three months that the plaintiffs claim they spent actively pursuing a contract. The same is true of the fact that the plaintiffs' visits were unscheduled given the allegation that this was prompted by the Hotel's repeated failure to schedule a meeting with the Wedding Specialist, despite Mrs. Keck's numerous requests to that effect. The Hotel's justification based on the busyness of the new Wedding Specialist may account for some of the Hotel's conduct, but a jury could find that it does not explain away its lack of communication during the month of September. This was a month in which Mrs. Keck visited the hotel three times (twice when the Wedding Specialist was present), repeated her request to pay the deposit and sign a contract, and placed a ten-day hold on her desired wedding date.

The jury could also conclude that the Hotel's proffered justifications are not the real reasons for its actions because of the experiences of the testers from the Fair

Housing Center.  The experiences of testers have been held probative on the question of discriminatory intent.  *See Reeves v. Rose*, 108 F. Supp. 2d 720, 728 (E.D. Mich. 2000); *Zuch v. Hussey*, 394 F. Supp. 1028, 1051 (E.D. Mich. 1975).  The Hotel challenges the relevance of these visits in that they occurred after the plaintiffs had ceased contact with the Hotel, but the jury may find that this point hurts the Hotel's case.  That three of four tests may reveal evidence of discriminatory treatment *after* the "period of unique business upheaval" had passed may suggest to the jury that the alleged "business upheaval" was not the real reason for the plaintiffs' "poor service" and inability to secure a contract.

Although the plaintiffs' counter-arguments and references to testing data do not necessarily disprove the Hotel's justifications, they rebut them sufficiently to survive summary judgment.  *See Blair v. Henry Filters, Inc.*, 505 F.3d 517, 532 (6th Cir. 2007).  There is a genuine issue of material fact in this case as to whether the plaintiffs were victims of bad timing and just slipped through the proverbial cracks, or whether the Hotel denied them the right to enter into a contract because of their race.

For the foregoing reasons, the District Court's opinion and order granting the Hotel's motion for summary judgment is reversed, and the plaintiffs' claim against the Hotel is remanded for trial.