NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

File Name: 15a0400n.06

Case No. 14-6400

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Jun 02, 2015
DEBORAH S. HUNT, Clerk

RENAISSANCE/VALLEY FARMS, LLC,
DKCD, INC., & DONALD J. COOK,

*Plaintiffs-Appellants*,

v.

T&C CONTRACTING, INC.,

*Defendant-Appellee*.

)
)
)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE WESTERN
DISTRICT OF KENTUCKY

O P I N I O N

BEFORE: McKEAGUE and DONALD, Circuit Judges; MATTICE, District Judge.[*]

**MATTICE, District Judge.** Renaissance/Valley Farms, LLC, DKCD, Inc., and Donald J. Cook (hereinafter, "Appellants" or "the Renaissance parties") raised claims under Kentucky law for breach of contract, negligence, and contractual and common law indemnity against T&C Contracting, Inc., (hereinafter, "T&C" or "Appellee") arising out of T&C's subcontract with DKCD to perform certain roadway construction work. On cross motions for summary judgment, the district court denied the motion of the Renaissance parties and granted T&C's motion as to all claims against T&C. The Renaissance parties timely appealed, and we now affirm the district court's decision.

---

[*]The Honorable Harry S. Mattice, Jr., District Judge of the United States District Court for the Eastern District of Tennessee, sitting by designation.

## I. Background

Although the procedural history of this action is complex, this matter comes before this Court solely for a review of the district court's judgment as to Appellants' claims against Appellee for breach of contract, negligence, and indemnification. The parties did not below, and do not now, dispute the vast majority of the basic facts underlying this action.

In 2004, Renaissance/Valley Farms, LLC (hereinafter, "R/V") commenced construction of a subdivision on the north side of Valley Station Road in Louisville, Kentucky. The project required certain road construction to be completed in order to accommodate the increase in traffic that would stem from the new subdivision, including the widening of a curved stretch of Valley Station Road and the construction of additional lanes of traffic. R/V – the "owner" of the project – contracted with DKCD, Inc., doing business as Renaissance Development, to serve as construction manager of the project (hereinafter, the "original contract").[1] DKCD retained Heritage Engineering, LLC to prepare engineering plans for the roadway construction project.

Because Valley Station Road is a state-owned right of way that is under the control of the Kentucky Transportation Cabinet (hereinafter, "KYTC"), R/V was required to apply for an encroachment permit in order to perform construction on the roadway. R/V submitted its application for such a permit, including the initial engineering site design plan prepared by Heritage (hereinafter, the "original plan"). In February 2005, the KYTC issued an encroachment permit to R/V to complete the construction as requested. The permit states:

> THE PERMITTEE AGREES THAT ALL WORK WITHIN THE EXISTING RIGHT-OF-WAY SHALL BE DONE IN ACCORDANCE WITH THE PLANS AS APPROVED AND PERMITTED BY AN ENCROACHMENT PERMIT. ANY CHANGES OR VARIANCES MADE AT THE TIME OF CONSTRUCTION WITHOUT WRITTEN APPROVAL FROM THE DEPARTMENT OF HIGHWAYS SHALL BE REMOVED BY THE

---

[1] Donald J. Cook is the principal and manager of R/V and the principal and president of DKCD. Where appropriate, R/V, DKCD, and Cook will collectively be referred to as "the Renaissance parties" and "Appellants."

PERMITTEE AT NO EXPENSE TO THE DEPARTMENT OF HIGHWAYS AND SHALL BE REDONE TO CONFORM WITH THE APPROVED PLANS.

The permit incorporates by reference the May 26, 2004 design plan prepared by Heritage, and states that "[t]he permittee agrees as a condition to the issuance of the permit to construct and maintain such facilities in accordance with said plan . . . ."

Steven Tucker, the engineer with KYTC who approved of R/V's encroachment permit, confirmed that KYTC would have to review any revisions to plans upon which a permit had been issued before such revised plans could be used to construct or complete a project. Tucker confirmed that such revisions are done by the engineer or the permittee, not by the construction company.[2]

In August 2005, DKCD entered into a subcontract with T&C to perform the construction work on Valley Station Road.[3] The relevant portions of the subcontract are as follows:

**SECTION FOUR**
**PERFORMANCE OF WORK**

A.      Subcontractor shall . . . perform all labor required for the completion of the above-described work in accordance with all provision of the original contract [between R/V and DKCD] and of the specifications, plans, and addenda referred to in the original contract, all of which are hereby made a part of this agreement, and to the satisfaction of owner and contractor.

. . .

**SECTION FOURTEEN**
**CHANGES, EXTRA WORK, AND DISPUTES**

A.      **Changes in Original Contract.**      Construction Manager is not an insurer or guarantor of the work or any part of the work; of the performance by owner of the original contract; or of plans and specifications furnished by owner.

---

[2] Tucker also testified that, when issuing such permits, the State does not "approve" of the specific plans; rather, the State reviews the plans and issues a permit if it appears that the plans meet state guidelines. Tucker stated that the State relies "strictly on the engineer" for the plan specifics, such as elevations.

[3] The subcontract was apparently not signed until September 12, 2005; however, the "effective date" of the contract was August 25, 2005.

Subcontractor shall be bound by any changes or alterations made by owner to the original contract specifications or plans, or in the amount or character of the work or any part of the work, to the same extent that contractor is bound by any such change or alteration.

B. **Notice of Change Order.** Subcontractor will be notified of any change order requested by or of owner with respect to subcontract work and will be consulted with respect to the proposed terms of any such change order, but subcontractor shall be bound by the terms of any change order negotiated in good faith by Construction Manager with owner. . . .

. . .

### SECTION TWENTY-FOUR
### SPECIAL PROVISIONS

Subcontractors shall comply with all federal, state, territorial, and local codes and statutes of the area involved and shall indemnify Construction Manager against any and all claims or liens as a result of acts or omissions on part of subcontractor with respect to any noncompliance with such codes and statutes.

It is undisputed that, at some point in 2005, Heritage prepared a revised site design plan for the Valley Station Road construction (hereinafter, "the revised plan").[4] Both the original and existing plans included a "typical section" providing for the road to be constructed with a cross slope of "2% minimum or continue existing grade" of the roadway. The revised plans also contained "spot elevations" that were to be used to grade the slope of the roadway construction because the drainage ditch would not allow for a continuous matching slope of the existing grade. It is undisputed that no one involved in the project – that is, the Renaissance parties, Heritage, or T&C – submitted the revised plans to the KYTC.

---

[4] The timeline of these events is not entirely clear from a review of the record. It appears that T&C had an opportunity to review the original engineering plans prior to signing its subcontract. According to T&C's president, Donald Thornberry, he reviewed the original site design plan and advised the Renaissance parties that those plans "would not work" due to the presence of a drainage ditch. The plans were then re-engineered by Heritage, and the revised plans were then given to T&C before it officially entered into its subcontract with DKCD.

According to T&C's president, Donald Thornberry, Les Gatrost – the project superintendent appointed by the Renaissance parties – brought T&C a copy of the revised plans.[5] It is undisputed that T&C used the revised engineering plans, rather than the original plans, to complete the construction work on Valley Road Station. Gatrost was present on the site for the duration of the construction work "almost on a daily basis" as the construction representative for the Renaissance parties.

T&C completed the construction as detailed in the revised plans prepared by Heritage. Specifically, it used the spot elevations specified in the revised plans – rather than the typical section regarding slope included in both the original and revised plans – to construct the roadway. The typical section is the default for construction work. However, where more specific instructions – such as spot elevations – are provided, the specific instructions will supersede the typical section. As constructed using the spot elevations, the turning lane on Valley Station Road had a "break" in the slope, with a cross slope of approximately two percent, as compared to the other lanes which had slopes of approximately six percent. Heritage intended there to be such a break in order to account for a drainage ditch at the site and therefore designed its revised plans to have such slopes.

However, when Tucker inspected the construction on behalf of KYTC upon its completion, he saw the break in the slope and immediately determined that the construction was not acceptable because it created a "flat lane going up against a superelevation." On July 24, 2008, KYTC issued an Encroachment Inspection notice to R/V, stating that KYTC was rejecting the roadway for several reasons, including that the turning lane did not have the correct cross

---

[5] Below, the Renaissance parties generally disputed T&C's contention that they had given the revised plans to T&C; however, the district court correctly found that the Renaissance parties failed to present any evidence to refute T&C's evidence that Gatrost provided the revised plans to Thornberry on behalf of the Renaissance parties, and indeed, they have failed to point to any such contradictory evidence on appeal.

slope and that there was a "[d]angerous edge drop off" between the edge of the roadway and a paved ditch. Subsequently, remediation work was completed by another construction company in order to bring R/V into compliance with its encroachment permit.[6]

After the Renaissance parties asserted their claims against T&C for breach of contract, negligence, and indemnification, T&C filed a motion for summary judgment before the district court. It argued that the work was not rejected due to any breach by T&C, but rather, because Renaissance failed to submit the revised plans to KYTC for approval; it further argued that the fact that the work was rejected is not proof that the work violated applicable codes and regulations. It argued that there was no breach of contract because its subcontract with DKCD required it to complete the construction in conformance with the plans designed by Heritage and provided by the Renaissance parties and because Renaissance supervised the construction project in conformance with the revised plans. Similarly, it argued that it was not negligent in performing the construction work pursuant to the revised plans because Kentucky law indicates that a contractor will not be deemed negligent when it does work in compliance with the instructions given to it. Finally, T&C argued that there was no negligent act or omission on its part to trigger the indemnity clause of the contract.

The Renaissance parties filed a cross motion for summary judgment, arguing that T&C was in breach of Section 24 of the subcontract because it agreed to accept "all risk of loss" in the event that its work did not comply with state codes or statutes, and KYTC's inspection notice was proof that T&C's work did not comply with all applicable codes and statutes. Specifically, they argued that T&C violated: (1) Section 177.106 of the Kentucky Revised Statutes ("KRS")

---

[6] The remediation work was completed upon payment from a bond secured from Developers Surety and Indemnity Company by DKCD. Developers commenced the underlying action in the district court; however, the Renaissance parties reached a settlement agreement with Developers in 2012, wherein they agreed to pay Developers damages and interest for Developers' required performance under the surety bond.

by creating an encroachment that interfered "with the safe, convenient and continuous use and maintenance" of Valley Station Road; (2) 603 Ky. Admin. Reg. 5:150 ("KAR 5:150") because the cross slope was below the acceptable cross-slope level as defined by the relevant engineering standards and incorporated by reference into Kentucky's regulations; and (3) 603 Ky. Admin. Reg. 1:020 ("KAR 1:020") because the work was not done as shown on the permits and approved plans. The Renaissance parties also argued that T&C was liable for negligence *per se* based on its violation of KRS 177.106(1).

The district court found that T&C neither breached its subcontract nor acted negligently, and that it was not required to indemnify the Renaissance parties. The district court noted that the Renaissance parties had failed to present any evidence to contradict T&C's evidence that it received the revised plans from Renaissance and constructed the roadway in accordance with those revised plans. The district court then found that T&C could not be found to have violated KRS § 177.106(1) because "the Renaissance Parties have not raised a genuine factual dispute as to whether T&C failed to remove an encroachment from the road in violation of the statutory language," noting that R/V was the permit holder as discussed in the statute. It further noted that no court had ever "applied the statute to impose liability on a contractor engaged in road construction." The district court similarly rejected the argument that T&C had violated KAR 5:150, finding that any violation with respect to errors in the cross slope as constructed was attributable to "Heritage, the design engineer, or the Renaissance Parties, as the party who contracted with Heritage to design the plans." The district court noted that the undisputed record evidence confirmed that contractors such as "T&C are expected to follow the engineering plans provided to them," and that T&C fulfilled its duty "to construct the roadway according to the plans it received from the Renaissance parties"; it thus concluded that the Renaissance parties

- 7 -

had failed to create a "genuine factual dispute as to whether T&C was required to apply independent judgment or engineering principles in its construction of the road." The district court then found no violation by T&C as to KAR 1:020, finding that T&C had no responsibility for submitting the revised plans to KYTC and that the responsibility for any violation of this subsection would lie with the permittee – R/V – or the engineer – Heritage. The district court further noted that T&C was required by its subcontract "to complete the roadwork in accordance with the plans and specifications provided by the Renaissance parties," and that the Renaissance parties failed to present any evidence to contradict T&C's evidence that it complied with this requirement. Because the Renaissance parties failed to create any issue of fact that T&C's work "was substandard or technically unsound," the district court concluded that any "deficiencies" in the construction work were "more appropriately attributed to the Renaissance Parties for failing to submit, or in not instructing Heritage to submit, the revised plans to the KYTC." Finding no violation of codes or regulations on the part of T&C, the district court found that T&C was entitled to judgment as to the Renaissance parties' claim for breach of contract.

Based on these same findings, the district court concluded that the Renaissance parties failed to establish that T&C violated any statutes or regulations in order to establish negligence *per se* or that it breached the standard of care applicable to its performance under the subcontract. The district court accordingly found that T&C was also entitled to judgment as to the issue of negligence and that it was not required to indemnify the Renaissance parties for any loss, and it granted T&C's motion for summary judgment and denied the motion for summary judgment filed by the Renaissance parties.

## II. Standard of Review

We review *de novo* the district court's summary judgment determination, but we review "the court's findings of specific facts for clear error." *Keck v. Graham Hotel Sys.*, 566 F.3d 634, 636 (6th Cir. 2009). Summary judgment is proper when, viewing the evidence in the light most favorable to the nonmoving party, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). If, however, sufficient probative evidence supports a claim that disputes over material facts remain, summary judgment is not appropriate, and the case must be resolved by a judge or jury at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986); *see also White v. Wyndham Vacation Ownership, Inc.*, 617 F.3d 472, 475-76 (6th Cir. 2010). "We review cross motions for summary judgment under this standard as well, evaluating each motion on its own merits." *La Quinta Corp. v. Heartland Props., LLC*, 603 F.3d 327, 335 (6th Cir. 2010).

Questions of statutory interpretation are questions of law subject to *de novo* review. *Vander Boegh v. EnergySolutions, Inc.*, 772 F.3d 1056, 1059 (6th Cir. 2014). In Kentucky, the interpretation of a contract is also a question of law subject to *de novo* review. *Cogent Solutions Grp., LLC v. Hyalogic, LLC*, 712 F.3d 305, 309 (6th Cir. 2013).

## III. Discussion

On appeal, the Renaissance parties argue that the district court erred in finding that T&C did not violate the cited statutes and regulations and in finding that the construction work was rejected based on failure to comply with the original plans submitted to KYTC, rather than because the work performed by T&C was deficient and dangerous.[7] The Renaissance parties

---

[7] This Court may review the district court's denial of a motion for summary judgment when the appeal from that denial "is presented together with an appeal from a grant." *McMullen v. Meijer, Inc.*, 355 F.3d 485, 489 (6th Cir.

argue for the first time that T&C also breached Section 4 of the subcontract by working from the revised plans, rather than from the "original" plans incorporated by reference into that Section; that is, Renaissance argues that T&C had an affirmative duty under [S]ections 4 and 24 of its subcontract "*not* to follow the [revised] plans." Alternatively, they argue that, even if Section 4 did require T&C to follow the revised plans, the doctrine of repugnant clauses required the district court to enforce "the more essential" provision of the contract – Section 24. They reassert their argument that T&C is liable for negligence *per se* based on its violation of the cited statutes and also argue that T&C was negligent in failing to recognize and/or to call to Appellants' attention that "the plans from which it worked called for the creation of unsafe and dangerous conditions."

In response, T&C reiterates its position that it was bound by the subcontract to complete the construction work according to the revised plans provided by the Renaissance parties – either under Section 4 because the revised plans were the original set of plans given to T&C upon the signing of the subcontract or under Section 14(A) because that provision bound T&C to any revisions to the plans approved by the Renaissance parties. It further argues that the doctrine of repugnant clauses was not properly asserted by the Renaissance parties before the district court and is thus not properly before this Court. Regardless, T&C argues that the doctrine is not applicable in this case because Sections 4 and 24 are not inherently "repugnant" or, to the extent that they are, Section 24 is not more essential to the contract than Section 4. T&C also reasserts its arguments that: it lacked discretion or responsibility to reassess the engineering principles relied upon by Heritage in creating the revised plans; it was not negligent in performing its work pursuant to and in conformance with the revised plans; the Renaissance parties have failed to

---

2004) (per curiam). Accordingly, the Appellants' appeal is properly before this Court as to both the denial of their own motion for summary judgment and as to the grant of T&C's Motion.

establish that any violation of statute or regulations led to their losses; and regardless, it does not bear the responsibility for any alleged violations of statutes or regulations.

### A. Breach of Contract

The Court will first consider Appellants' claim that T&C breached its subcontract. In Kentucky, the complaining party must establish the following three elements to prove a claim for breach of contract: (1) the existence of a contract; (2) breach of that contract; and (3) damages flowing from that breach. *Metro. Louisville/Jefferson Cnty. Gov't v. Abma*, 326 S.W.3d 1, 8 (Ky. Ct. App. 2009).

Appellants pled their claim for breach of contract relying solely upon Section 24 of the subcontract, which provided that T&C "shall comply with all federal, state, territorial, and local codes and statutes of the area involved and shall indemnify Construction Manager against any and all claims or liens as a result of acts or omissions on part of subcontractor with respect to any noncompliance with such codes and statutes." Appellants have repeatedly argued that the fact that T&C complied with the revised engineering plans is "irrelevant" to the consideration of whether T&C breached Section 24 of the subcontract. However, a contract "must be construed as a whole, giving effect to all parts and every word in it if possible." *City of Louisa v. Newland*, 705 S.W.2d 916, 919 (Ky. 1986); *see also Ky. Spirit Health Plan, Inc. v. Commonwealth Fin. & Admin. Cabinet*, Nos. 2013-CA-001050-MR, 2013-CA-001201-MR, 2015 WL 510852, at *4 (Ky. Ct. App. Feb. 6, 2015) ("[W]e attempt to divine intent from the scope of the entire agreement, not by relying simply on individual terms or phrases examined in isolation."). The Court thus rejects Appellants' contention that Section 24 of the subcontract must be analyzed in a vacuum, without consideration to the parties' complete set of obligations under the contract.

In this case, the Court's *de novo* review of Appellants' claim for breach of contract leads to the same conclusion reached by the district court: that T&C's construction work on Valley Station Road did not constitute a breach of contract. Appellants first contend that T&C violated KRS § 177.106(1), which provides:

Before any person shall proceed to cause or continue or allow to remain in existence any encroachment under, on or over any part of the right-of-way of a state highway he shall first obtain from the Department of Highways a permit so to do. Any encroachment heretofore or hereafter placed or allowed to continue or remain under, on or over any road which is found by the Department of Highways to be interfering in any way with the safe, convenient and continuous use and maintenance of such road shall upon thirty (30) days['] notice to the person or to his chief agent by the Department of Highways be removed or relocated by such person at his own expense.

Appellants argue that T&C violated this statute by constructing the roadway in such a manner as to trigger the violation notice from the KYTC pursuant to R/V's encroachment permit.

Appellants' reading of this statute is, however, untenable. By its plain language, Section 177.106(1) applies to the encroachment permit holder, as it speaks only to the permitee's obligations to obtain a permit and to remediate any encroachment found by the KYTC to violate the terms of the permit. There is no dispute that (1) T&C was not required to obtain an encroachment permit, (2) T&C had no encroachment permit, (3) KYTC did not issue a notice to T&C regarding a violation of any encroachment permit, and (4) T&C was not required to – nor was it asked to – remove the encroachment. Because Section 177.106(1) speaks only to a permittee's obligations and T&C was not a permittee, the statute does not apply to T&C in its role as a subcontractor construction company, and T&C thus had no obligations under the statute. Appellants have failed to establish not only that T&C did not comply with this statute, but that it was required to comply with this statute at all. Accordingly, Section 177.106(1) cannot serve as a basis for finding in Appellants' favor as to breach of contract.

Appellants also argue that T&C is in breach of Section 24 of the subcontract for violating KAR 1:020 and 5:150. Section 1:020 provides, in relevant part, that,

> The owner or occupant of property . . . who desires to construct new or additional driveway entrance approaches, to relocate, or make other changes in existing driveway entrance approaches thereto, shall make application for a permit to the District Engineer of the Department of Highways upon standard forms furnished by the Transportation Cabinet. . . .
> All work involved is to be done wholly at the expense of the permittee and in accordance with the approved permit and plans. . . .
>
> . . .
>
> . . . To insure the safety of the highway user and to protect highway facilities against damage, the entrance approach shall be constructed or installed as shown on the permit, documents and plans approved by the Department of Highways.

603 Ky. Admin. Reg. 1:020 § 1(2)(a)-(b), (3)(b).[8] Section 5:150 incorporates by reference KYTC's "Permits Manual" to apply to work done pursuant to encroachment permits; the Permits Manual itself adopts the American Association of State Highway Transportation Officials' Policy of Geometric Design of Highways and Streets (hereinafter, "the Green Book"), which provides engineering standards for roadway projects. Appellants argue that, because T&C did not construct the road pursuant to the plans on file with KYTC in connection with R/V's encroachment permit, and because it did not construct the road with a 4.3 percent cross slope called for by the Green Book, T&C violated both of these regulations in breach of its promise to comply with all state codes.

It is undisputed that the road work, as completed, did not comply with Section 1:020, as the construction was completed in accordance with the revised plans, rather than in accordance with the original engineering plans on file with KYTC. It is also undisputed that T&C did not construct the road with a 4.3 percent cross slope but instead constructed the road with an

---

[8] It is undisputed that the construction on Valley Station Road qualifies as a "driveway entrance approach" under this regulation.

approximately 2 percent cross slope as called for by the spot elevations provided in the revised plans. Nonetheless, the Court simply cannot find that T&C breached its subcontract.

First, the regulations that Appellants complain were violated relate directly to the process of obtaining and complying with encroachment permits issued by the State of Kentucky. In this case, R/V obtained such a permit, the terms of which required R/V to ensure that all work "be done in accordance with the plans as approved and permitted," and to obtain prior written approval of "any changes or variances" to those plans. Indeed, R/V "agree[d] as a condition to the issuance of the permit to construct and maintain such facilities in accordance with said plan[.]" Nonetheless, Appellants provided T&C with a revised set of plans that varied from the plans that had been authorized by the KYTC when the permit was issued and failed to obtain prior written approval of those revised plans. Appellants then supervised the construction of the Valley Station Road project utilizing the revised plans, rather than the original, permitted plans. The revised plans were created by Appellants' retained engineer, Heritage, whose representatives have testified that the work was completed in precisely the manner intended by Heritage when it prepared the revised plans.

Appellants have attempted to construe the language of various statutes and regulations in a manner that would allow it to shift the blame for the deficiency notice onto its subcontractor, T&C. But none of Appellants arguments compel the Court to conclude that T&C's subcontract relieved R/V of its obligations pursuant to its permit from the KYTC or shifted the responsibility for engineering and design principles from the retained engineer, Heritage, to the construction subcontractor, T&C. To the extent that any act or omission resulted in a violation of the cited regulations, such act or omission was on the part of the Renaissance parties and/or Heritage.

Appellants argue that such a conclusion ignores the plain language of the contract, as T&C agreed in Section 24 of its subcontract to comply with, and therefore be liable for all violations of, all state codes and statutes. However, Section 4 of the contract required T&C to "perform all labor required for the completion of the [construction project] in accordance with all provisions of the original contract and of the specifications, plans, and addenda referred to in the original contract." Section 14 further required T&C to be "bound by any changes or alterations made by owner to the original contract specifications or plans, or in the amount or character of the work or any part of the work[.]"[9] If Appellants' broad reading of Section 24 is correct, T&C was in a classic catch-22: it could comply with the work requirements of the contract, by constructing the roadway pursuant to the revised plans provided by the Renaissance parties, but in doing so risk being in breach of Section 24 of its contract, *or* it could instead comply with the original plans approved of by KYTC, but then risk being in breach of the work provisions of the contract for not complying with the revised plans.[10]

However, a complete reading of Section 24 undermines Appellants' position and affirms the conclusion reached by the district court. Section 24 requires T&C to comply with all laws

---

[9] On appeal, T&C has argued that the contract required it to comply with the revised engineering plans, either because they were part of the original contract referenced in Section 4 or because the revised plans constituted a change or alteration of the original contract by the owner that T&C was bound to follow as described in Section 14. The district court did not consider the specific issue of whether Section 4 or Section 14 required T&C to follow the revised plans; instead, it simply found that the contract required T&C to work from the plans provided to it by the Renaissance parties.

Upon consideration of the arguments and evidence, the Court agrees with the Renaissance parties that Section 4 required T&C to perform its work pursuant to the "original contract" – that is, the contract between R/V and DKCD that included the original engineering plans. However, the Court further finds that, by providing the revised engineering plans to T&C and by supervising T&C's construction work using those revised plans, the Renaissance parties invoked Section 14 of the subcontract which "bound" T&C to "any changes or alterations made by owner to the original contract specifications or plans." Thus, T&C was contractually obligated to perform its construction work in conformance with the revised engineering plans and was not, as Appellants argue, obligated by its subcontract to ignore the revised plans and proceed with construction based on the original plans.

[10] Indeed, Appellants have noted that "[a] builder usually can comply with both plans and codes and statutes at the same time. Section 4(A) and Section 24 come into conflict only if plans call for construction in violation of codes and statutes."

- 15 -

"of the area involved" and to indemnify Appellants "against any and all claims or liens as a result of acts or omissions *on part of the subcontractor.*" In interpreting this provision, we rely – as did the district court – upon *City of Louisville v. Padgett*, 457 S.W.2d 485 (Ky. Ct. App. 1970):

> [T]he contractor should be relieved from checking every order given it . . . . The [entity] for whom the contractor works does the engineering, stakes out the project, tells the contractor what to grade and what to do and so long as the contractor complies with these instructions by its superior then the contractor is fulfilling its obligation. If the contractor was required, at its peril, to check and double check all plans given it and required to keep an engineering force for the purpose of interpreting these plans, and was not permitted to follow the orders of the engineering force of its superior, then the costs of public improvement would be so increased as to make them almost prohibitive. . . . The contractor's work is not the engineering job of laying out the project but is merely in doing what it is instructed to do. So long as it does this work as it is instructed to do by its superior in a workman like manner, not negligently, then the contractor is not liable.

*Id*. at 490 (quoting *Wood v. Foster & Creighton Co.*, 235 S.W.2d 1, 3 (Tenn. 1950)).[11]

The Court concludes that the statutes and regulations relied upon by Appellants, which pertain to the rights and obligations of permit holders, as well as to engineering design principles, are not "of the area involved" by subcontractor T&C – that is, those statutes and regulations are not binding on or relevant to a subcontracting construction company. The undisputed evidence demonstrates that T&C's area of expertise was construction based on plans that had been prepared by engineers – not the area of engineering itself. T&C's contract required it to perform the construction work pursuant to the plans provided and did not afford it any

---

[11] The parties argued at length regarding the applicability and relevance of *Padgett* to this case. The Court notes that material factual distinctions exist between the instant case and *Padgett*, which involved the issue of whether a contractor who contracted with a public agency may be liable for personal injury arising from oral changes to the work order. Nonetheless, the Court finds persuasive the discussion in *Padgett* regarding the role and responsibility of construction subcontractors that are provided engineering plans for their projects.

discretion in the execution of those plans.[12]  T&C complied with the engineering plans provided to it by the Renaissance parties, as required by the work provisions of its contract.[13]  Appellants have failed to demonstrate that T&C failed to comply with any codes or statutes in its area of involvement or that any "act or omission on part of subcontractor" led to the complained of violations.[14]  For these reasons, the Court concludes that T&C did not breach its subcontract and that the district court's grant of summary judgment on behalf of T&C was proper.[15]

### B. Negligence

We next turn to Appellants' claim against T&C for negligence.  In Kentucky, a plaintiff must prove the following elements in order to establish negligence: "(1) the defendant owed a duty of care to the plaintiff, (2) breach of that duty, (3) injury to the plaintiff, and (4) legal causation between the defendant's breach and the plaintiff's injury."  *Osborne v. Keeney*, 399 S.W.3d 1, 17 (Ky. 2012).

Below, Appellants framed their negligence claim as one for negligence *per se* based on T&C's purported violation of KRS § 177.106.  A claim for "[n]egligence *per se* 'is merely a

---

[12]  Appellants argue that such a reading of the contract would render Section 24 completely moot.  However, this argument presupposes that the statutes and regulations cited by the Renaissance parties are the only "federal, state, territorial, and local codes and statutes" relevant to such a project.

[13]  Appellants also argue on appeal that T&C is in breach of contract because it failed to complete its work "to the satisfaction of owner and contractor," as provided by Section 4 of the subcontract.  However, Appellants failed to timely raise this argument below, and the Court will not consider the argument for the first time on appeal.  *See, e.g.*, *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546 (6th Cir. 2008).  The Court nonetheless notes that Appellants' claim for breach of contract was premised solely upon a violation of Section 24 of the subcontract, not on Section 4.  Furthermore, any argument that T&C's work was not completed "to the satisfaction of owner and contractor" because it was performed pursuant to the revised plans but resulted in a deficiency notice is fatally circular, in that Appellants could have argued that the work was not satisfactory because T&C *did* comply with the revised plans and because it did *not* comply with the revised plans.

[14]  This reading of Section 24 allows the Court to give meaning to all of the provisions and terms of the subcontract.  In doing so, the Court has found no repugnancy between Section 24 and the work provisions of the subcontract, and it accordingly need not address the parties' arguments regarding the applicability of the doctrine of repugnant clauses.

[15]  The Court's holding does not undermine the well-settled principle that parties may, by contract, allocate risk and liability; the Court merely holds that, under this contract and these circumstances, T&C is not liable for the statutory violations alleged by the Renaissance parties.

negligence claim with a statutory standard of care substituted for the common law standard of care.'" *Young v. Carran*, 289 S.W.3d 586, 588-89 (Ky. Ct. App. 2008) (quoting *Real Estate Mktg, Inc. v. Franz*, 885 S.W.2d 921, 926-27 (Ky. 1994)). The Court has previously discussed Section 177.106 and has found that it applies only to encroachment permit holders and not to subcontracting construction companies, such as T&C. The Court has also found that T&C did not have any obligations pursuant to that statute and that it did not – and indeed could not – violate the statute. For these same reasons, Appellants' claim for negligence *per se* must fail, and we affirm the district court's holding to that effect.

On appeal, Appellants have reframed their negligence claim, arguing that T&C breached its duty of care to Appellants by failing to recognize and/or call to Appellants' attention that "the plans from which it worked called for the creation of unsafe and dangerous conditions," arguing that they "reasonably relied upon T&C's experience and expertise" regarding the cross slope and drop off. However, Appellants have nonetheless failed to create a genuine issue of material fact with regard to the issue of negligence. Appellants failed to point to any evidence in the record that contradicts T&C's evidence that construction companies working pursuant to subcontracts have a duty to comply with the engineering plans provided by the owner. Appellants have also failed to present any evidence or authority suggesting that subcontractors have a common law duty to second guess or reevaluate the engineering plans provided to them. Indeed, the Court finds that, quite to the contrary, *Padgett* holds that there is no such duty. *See Padgett*, 457 S.W.2d at 490. Having breached no duty to the Renaissance parties, T&C was entitled to judgment as to the claim for negligence.

## C. Indemnification

Finally, Appellants maintain that they are entitled to indemnity from T&C for the cost of the ameliorative construction work. We have now determined that the district court's findings that T&C did not breach its contract and did not act negligently should be affirmed. Because we have concluded that T&C is not liable to the Renaissance parties – at common law or under the terms of the subcontract – we must also conclude that the Renaissance parties are not entitled to indemnity as "one cannot be required to indemnify if one is not liable." *York v. Petzl Am., Inc.*, 353 S.W.3d 349, 354-55 (Ky. Ct. App. 2010); *see also Clark v. Hauck Mfg. Co.*, 910 S.W.2d 247, 253 (Ky. 1995) *overruled on other grounds by Martin v. Ohio Cnty. Hosp. Corp.*, 295 S.W.3d 104 (Ky. 2009).

## IV. Conclusion

In this case, all of the parties involved could have – and perhaps should have – taken different actions that would have prevented the need for remedial construction. But the Court's job is not to determine, with the benefit of hindsight, the ideal course of action for each party to this project. Instead, the Court is tasked with analyzing the contract, interpreting the relevant statutes and regulations, and determining the parties' duties, obligations, and liabilities. Here, T&C had a duty to comply with the terms of its subcontract and to complete the construction work it was tasked with pursuant to the plans provided to it by the Appellants. There is no genuine dispute that it did so, and Appellants have failed to present a compelling argument that T&C was obligated – contractually or at common law – to do more.

For these reasons, we **AFFIRM** the judgment of the district court in all respects.